Filed 5/20/21  P. v. Jackson CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D076466 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD275644) |
| NOAH MITCHELL JACKSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Michael S. Groch, Judge.  Affirmed.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael P. Pulos and Joseph C. Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A 65-year-old homeless man was stabbed to death on the streets of Ocean Beach. The homicide was seen by eyewitnesses and recorded on video by surveillance cameras of nearby businesses, but the assailant ran off and was not immediately apprehended. After an investigation, Noah Mitchell Jackson was determined to be the perpetrator of the homicide.

A jury found Jackson not guilty of first degree murder (Pen. Code, §§ 187, subd. (a), 189, subd. (a)),[1] but guilty of second degree murder (§§ 187, subd. (a), 189, subd. (b)). The jury found true the allegation that Jackson used a deadly weapon, a knife, in the commission of the offense. (§ 12022, subd. (b)(1).) Jackson was sentenced to a prison term of 15 years to life.

Jackson appeals, asserting that errors of constitutional dimension arose when (1) the trial court restricted his counsel's cross-examination of a critical prosecution witness; (2) the trial court declined to instruct the jury on voluntary manslaughter on a heat of passion theory; (3) the trial court excluded his proffered third party culpability evidence; (4) the jury convicted him based on insufficient evidence; and (5) the foregoing errors are aggregated, resulting in cumulative error.

We conclude these contentions lack merit. Accordingly, we affirm the judgment.

---

[1] Further unspecified statutory references are to the Penal Code, unless otherwise indicated.

FACTUAL AND PROCEDURAL BACKGROUND[2]

I.

*The Prosecution's Case*

A.   *The Stabbing Death of Walter "Ras" R.*

1.   *Testimony of Jamie H.*

Just after midnight on June 22, 2017, Jamie H.[3] was at a reggae concert at Winstons Beach Club (Winstons) on Bacon Street in Ocean Beach. At around 12:20 a.m., Jamie left Winstons to join some friends on the sidewalk outside the club. At some point, he looked "[d]irectly across" Bacon Street and saw a person "striking" Walter "Ras" R. Ras was an older African-American homeless person known to Jamie, and other locals, as the "Incense Man" because he sold incense to people on the street.

Ras was standing on the sidewalk in front of a retail clothing store on the west side of Bacon Street. Jamie saw the assailant "repeatedly punch[ ]" Ras in "rapid arm movement[s]" directed horizontally into Ras's "chest area or middle body area." The assailant struck Ras three or four times. Ras then crumpled to the ground. Jamie did not see Ras try to strike the assailant or otherwise defend himself. After he saw the assailant striking Ras, Jamie heard a female voice scream, "He's got a knife." Jamie did not see a knife but immediately assumed Ras had been stabbed rather than punched.

---

[2]   Because Jackson's appeal implicates the substantial evidence standard of review, we summarize the evidence and state the relevant facts in the light most favorable to the judgment. (*People v. Jennings* (2010) 50 Cal.4th 616, 638.)

[3]   Pursuant to rule 8.90(b)(10) of the California Rules of Court, which governs privacy in opinions, we have opted to refer to private citizen witnesses by their first name and the first initial of their last names, and then by first name only. Under rule 8.90(b)(4), we do the same for the victim.

As Ras crumpled to the ground, the assailant fled and Jamie gave chase. At one point, when Jamie was 10 or 12 yards behind the assailant, he heard the assailant make comments to passersby riding on bicycles that sounded something like, "I stabbed that guy" or "I got that guy." The tone of the assailant's comments was similar to someone bragging.

Unable to keep up with the assailant, Jamie pulled out his cell phone and called 911. Jamie's 911 call was received at 12:25:26 a.m. on June 22. He reported a stabbing at Bacon Street and Newport Avenue, and told the 911 dispatcher where he last saw the assailant and that the assailant was wearing "blue jeans" and "a grey hoodie."

Jamie testified that the area where Ras was stabbed was "very well lit" and he could see during the assault that the assailant was wearing blue jeans and "some form of a hooded sweatshirt" that was a "silver gray-ish color." Jamie never saw the assailant's face because he had the hood of the sweatshirt up over his head. From his observations during the chase, Jamie estimated the assailant was five feet 10 inches tall and concluded from the assailant's body movements that he was "[m]ost definitely" a "younger" person.

2. *Testimony of Ryan H.*

Ryan H. was another patron attending the reggae concert at Winstons on June 22, 2017. Between midnight and 12:30 a.m., Ryan left the club and called for an Uber car. As he was standing on Bacon Street outside the club, he looked up and noticed two men standing across the street. One of the men fell, and the other man "took off running." The man who fled was wearing a gray hooded sweatshirt with the hood up, so Ryan could not see his face.

Ryan ran across the street to see if the victim was okay. He found an older African-American man, perhaps in his 50s or 60s, lying on his back and

4

bleeding.  The victim was conscious but not responsive to Ryan's questions. Ryan knelt down and lifted the victim up by his shoulders and saw there was a stab wound in his back.

Ryan attempted to perform CPR on the victim and called 911.  His 911 call was received at 12:25:33 a.m.  Ryan reported that someone had been stabbed on Bacon Street and that the suspect "had on blue jeans and a gray white hoodie" and had a knife.  While he was speaking with the 911 dispatcher, a police officer arrived onto the scene.

3.    *Testimony of Officer Jonathan Scull*

Officer Jonathan Scull of the San Diego Police Department[4] arrived at approximately 12:28 a.m. on June 22, 2017.  He found Officer Sarah Sutter actively performing chest compressions on Ras and assisted her with the CPR efforts.  Officer Scull saw blood on Ras's pants, around his groin area, which had soaked through his shirt.  He undressed Ras to assess his injuries and saw a stab wound to his leg and a stab wound to his back.

Paramedics arrived and transported Ras to the hospital.  Lifesaving measures were taken but were unsuccessful.  Ras was pronounced dead at 1:06 a.m.

4.    *Cause of Death*

The medical examiner determined that Ras was 65 years old, six feet two inches tall, and 161 pounds at the time of his death.  The autopsy revealed Ras had suffered six stab wounds.

Three of the wounds were superficial.  The fourth wound was on Ras's left forearm.  It was one inch long and one and one-half to two and one-half

---

[4]    Unless specified otherwise, all law enforcement personnel discussed herein are members of the San Diego Police Department.

inches deep.  The medical examiner determined from the appearance of this wound that the weapon that caused it was consistent with a knife that had one sharp edge and one blunt edge.  The fifth wound was one to two inches deep and was located in Ras's upper left thigh.

The sixth stab wound was on the left side of Ras's back.  It was one and one-quarter inches long and four to six inches deep.  It penetrated Ras's chest wall and completely incised his ninth rib, cutting it in half.  It penetrated the lower lobe of Ras's left lung through and through.  It then penetrated Ras's heart through the left ventricle and the muscle between the left and right ventricles, terminating with a small incised wound that partially punctured the right ventricle.  This wound was fatal and likely caused Ras to bleed to death.

The medical examiner concluded Ras died from multiple sharp force injuries.

B.    *Video Footage from Surveillance Cameras in the Area*

Detectives Robert Korbecki and Timothy Radtke responded to the crime scene in the very early morning of June 22, 2017 to investigate a possible murder.  From Jamie's statement, the detectives had a description of the suspect and the route taken by the suspect fleeing from the crime scene. They began to collect and review video evidence from surveillance cameras installed by local businesses in the area.  During their investigation, the

detectives gathered surveillance videos recorded from over a dozen Ocean Beach businesses.[5]

Surveillance cameras recorded the homicide of Ras, as well as the suspect's flight after the homicide and his path of travel in the area before the homicide.

1.    *The Homicide*

Ras was stabbed on the sidewalk in front of the Temptress Fashion Shop on the west side of Bacon Street.  Directly across from the shop was Winstons, on the east side of Bacon Street.  Immediately next to Winstons was the Arizona Cafe, separated by a small alley.  Both Winstons and the Arizona Cafe had surveillance cameras directed at the location where Ras was stabbed.  All three of these businesses were near the intersection of Bacon Street and Newport Avenue.  Newport Avenue runs roughly west and east, and ends at the beach.  Bacon Street runs perpendicular to Newport Avenue in a roughly north and south direction.

---

[5]    Jackson requested transmittal to this court of select photographic exhibits from the trial.  The request was granted, and we have reviewed these exhibits.  We independently directed the superior court to transmit the remaining trial exhibits, including the surveillance video exhibits, to this court under California Rules of Court, rule 8.224(d), and have reviewed these as well.

Footage from the Winstons camera, at time stamp 12:24:15 a.m. on June 22, 2017,[6] showed Ras falling to the ground on the sidewalk across the street as another person ran away. At 12:24:26 a.m., Jamie, wearing a blue jacket and shorts, walked into the middle of Bacon Street.

Footage from the Arizona Cafe camera, at 12:14:35 a.m., showed Ras standing on the sidewalk in front of the window of the Temptress Fashion Shop. Approximately a minute later, the suspect, wearing a light-colored hoodie and dark pants, walked north on Bacon Street past Winstons and then crossed to the west side of Bacon Street. He continued north on Bacon Street but then stopped at 12:16:00 a.m., turned around and walked toward Ras. He passed Ras, who was still standing in front of the Temptress Fashion Shop, but then turned around and walked back toward Ras again. At 12:16:13 a.m., the suspect stopped next to Ras and the two men remained standing in this position for more than two minutes.

At 12:19:24 a.m., Ras walked south on Bacon Street and out of view. The suspect immediately followed Ras south on Bacon Street and out of view.

At 12:22:20 a.m., Ras walked north on Bacon Street and returned to his original location in front of the Temptress Fashion Shop. At 12:23:00 a.m., the suspect walked toward Ras and stood next to Ras for a little over one

---

[6]     The detectives determined the accuracy of the time stamps for some, but not all, of the surveillance cameras. Where the detectives were able to confirm the accuracy of the time stamps, they did so to the minute, but not to the second. Thus, videos determined by the detectives to be properly calibrated could still have been off by 59 seconds in either direction. Unless specified otherwise, the accuracy of the time stamps is unknown. Since all of the surveillance video footage was captured on June 22, 2017, we omit this date from our subsequent descriptions. Finally, for ease of the reader, we have converted all time stamps from military to civilian time. For example, a time stamp of 00:14:35 is stated as 12:14:35 a.m.

minute.  At 12:24:15 a.m., the suspect lunged at Ras, and Ras fell to the ground.  The suspect immediately fled south on Bacon Street.

Jamie confirmed at trial that the Arizona Cafe video accurately depicted "the moments and minutes leading up to the stabbing" of Ras.

2. *The Suspect's Flight After the Homicide*

Jamie chased the suspect as he fled south on Bacon Street toward Newport Avenue.  He ran east a short distance on the north sidewalk of Newport Avenue, past a Starbucks, and then turned into a parking lot next to the Apple Tree Supermarket (Apple Tree).  Here, Jamie could not keep up with the suspect and watched the suspect run north through the parking lot, turn to run east through an alley, and around the corner of a CVS store that abutted the alley to the north.

A camera installed on the north side of the Apple Tree recorded the area of the parking lot.  A loading dock at the rear of the CVS had a surveillance camera that recorded a small section of the alley.  Video footage from the Apple Tree camera, time stamped at 12:22:46 a.m., and the CVS camera, time stamped at 12:23:00 a.m., showed the suspect running through the parking lot and alley, as described by Jamie.  The suspect was wearing a light-colored hoodie, with the hood pulled over his head; dark loose-fitting pants; and shoes that were a lighter color than his pants.

3. *The Suspect's Path of Travel Before the Homicide*

Surveillance videos from various businesses along Newport Avenue showed the suspect walking west on Newport Avenue toward Bacon Street, approximately 10 minutes before the homicide occurred.  A Bank of America ATM machine (ATM) was embedded in the exterior wall of the Apple Tree, which was on the north side of Newport Avenue, near Bacon Street.  The ATM had three cameras, each showing the sidewalk on Newport Avenue.

9

The area in front of the ATM was well-lit and because the cameras recorded in color and had a good vantage point of passersby, images of the suspect from these cameras were clearer and better-defined than images from other surveillance cameras.

At 12:13:23 a.m., the suspect could be seen walking by the ATM, westbound on Newport Avenue toward Bacon Street. He was slender in build and wearing somewhat baggy pants that appeared dark in color and a light gray hoodie. Although the hood was up, he was turned toward the cameras, so his face and neck were partially in view. It could be seen that he had a long, straight, prominent nose, an angular jaw and cheekbones, and a chin less prominent than his nose. What appeared to be dark hair was visible under his hood.

C.    *Jackson Is Identified by Witnesses*

In September 2017, photographs of the suspect from the ATM surveillance footage were developed and used in a "Crime Stoppers" flyer. Law enforcement distributed the flyer to the public to aid in its investigation.

In separate interviews in October 2017, detectives interviewed Riley D., Kasey D., and Caleb W., all of whom were Jackson's friends or acquaintances and were with Jackson on the night of June 21, 2017, hours before the homicide. Each witness was shown the flyer. Riley told detectives that "on a scale of 1 to 10," he was "about a 7" that the suspect in the flyer was Jackson. Kasey immediately told detectives, "it looks a lot like [Jackson]." When detectives showed Caleb the flyer, he told them, "that's definitely [Jackson]. . . . yeah, that's him." At trial, Caleb confirmed the images of the suspect in the ATM video showed what Jackson "looked like that day."

10

D.  *Mary D.'s 911 Call*

On the morning of June 22, 2017, Detectives Korbecki and Radtke learned that a 911 call for a "welfare check" on a person matching the description of the suspect had been made one and a half hours before the homicide. The 911 call was placed by Mary D. at 10:58 p.m. on June 21 and originated from a residence that was one and one-half to two miles from the site of the homicide. Mary reported that she had been in a "physical" altercation with Jackson, who was threatening to commit suicide.

Testimony at trial established that Jackson had gone to dinner on the night of June 21 with his girlfriend, Makaela H., and several friends, including Caleb and Riley, Mary's son. After dinner, the group went to Riley's house on Orchard Avenue in Ocean Beach, about one and one-half miles from where Ras was killed. Some in the group, including Jackson, were drinking alcohol. Mary and her husband returned home at approximately 9:00 to 9:30 p.m. to find their sons, Riley and Kasey, at the house with Jackson and other people.

At some point, Jackson and Makaela started to argue and Makaela left the residence without him. Jackson grew "distraught" and "despair[ing]" over Makaela. Mary described him as "despondent" and unnerved. Jackson threatened to commit suicide by jumping off Sunset Cliffs.

Mary tried to calm Jackson down, but he said he wanted to leave to be with Makaela. Mary and her other son, Kasey, tried to keep Jackson from leaving because they were worried he was going to harm himself. As Jackson stood in the front doorway, Mary and Kasey put their arms around him. Jackson pulled against them with such force that all three of them fell to the ground in front of the house.

11

After she fell, Mary said, "forget it, I'm done here. I'm going to call the cops." She told Kasey to let Jackson go, and Jackson ran away. Mary immediately called 911 and reported that there had been a physical altercation at her house with Jackson, who was "high." She reported that Jackson had threatened suicide and she was concerned for his safety. She described Jackson as "look[ing] maybe Italian" and of "mixed race," both "[W]hite and Hispanic." She said Jackson was 19 years old, five feet seven inches or five feet eight inches tall, of "medium" build, and wearing "a white sweatshirt, [and] jeans."

Caleb testified that the "disagreement" with Makaela had "triggered" Jackson and he got "a little bit more hostile" and "a lot more aggressive with his words." Jackson was "on a rampage." Caleb saw Jackson and Kasey "fighting . . . , rolling around in the grass" with "punches being thrown." During this time, Jackson was not crying. Rather, Jackson was showing "anger."

When Caleb saw Jackson run off from Riley's house, Caleb chased after him because he was worried Jackson was going to harm himself. Caleb found Jackson in an alley off Orchard Avenue; he was crying and "talking about how [Makaela] doesn't love him." Caleb then walked Jackson to Makaela's house and as they walked, Jackson calmed down. When they arrived, Makaela was waiting for Jackson on the front porch. Caleb dropped Jackson off and left.

Makaela and Jackson sat down together on her front porch at around 11:30 p.m. After five or 10 minutes, Makaela went inside alone. Jackson remained outside because "he needed to breathe." Makaela went outside to check on Jackson approximately two to three times. ]Each time, he was sitting in the back seat of her father's car in the driveway. Three minutes

after she last checked on him and had gone back inside the house, Jackson called Makaela and told her they would talk the next morning and work everything out. Makaela went to bed alone. Although she usually went to sleep around 12:30 a.m., she could not recall what time she went to bed that night.

Makaela did not see Jackson again that night and she could not verify his whereabouts after she went to sleep. Jackson was not next to her when she woke up the next day, on June 22, 2017.

On June 22, Makaela heard the Incense Man had been killed. She and her family talked about the murder in Jackson's presence and expressed the hope that the killer would be found. The news coverage of the murder included photographs of the suspect. When Makaela saw photographs of the suspect, she thought the suspect "kind of looks like [Jackson]," but she didn't know "if it's him."

Makaela's house was on Newport Avenue, less than four blocks east of the location where Ras was killed. Jackson had been living there with Makaela for a few months. Video footage taken by a surveillance camera from a restaurant located on the south side of Newport Avenue, two blocks from Makaela's house, showed the suspect at around 12:12 a.m. walking west on Newport Avenue. The suspect was seen wearing a hoodie sweatshirt and dark pants and carrying a cell phone. The suspect could then be seen on camera after camera as he continued west on Newport Avenue to Bacon Street, where he assaulted Ras.

E.    *Jackson's Police Interviews*

On June 28, 2017, while driving on Newport Avenue, Detective Korbecki spotted Jackson standing in front of Makaela's house. He stopped briefly and asked Jackson where he had gone the night of June 21 after

13

leaving Riley's house. Jackson said he and Caleb had walked to Caleb's house, that he dropped Caleb off and then returned home to Makaela's house. Jackson said he was drunk that night. Detective Korbecki showed Jackson the photographs of the suspect from the Apple Tree video; Jackson claimed it was not him. Jackson also denied owning a light-colored hoodie.

On September 20, 2017, Detective Korbecki, accompanied by Detective Ryan Siemer, interviewed Jackson again. Detective Korbecki told Jackson he wanted to clarify what happened on June 21 after Jackson left Riley's house. This time, Jackson said he and Caleb had walked straight to Makaela's house, and that Makaela could "vouch" for his whereabouts that night.

Jackson told the detectives he had known the Incense Man. The detectives asked if Jackson had ever had problems with Ras. Jackson responded, "not really, I don't know anybody that just goes down there picking on homeless people, to be honest, like I'm -- that's stuff we used to [do] when we were kids."

F.    *Testimony of Wayne J.*

Wayne J., a 61-year-old resident of Ocean Beach, frequented Stuff2Puff, a tobacco store on Newport Avenue a little more than a block east of Bacon Street. Wayne was familiar with many of Ocean Beach's younger residents, including Jackson. In June 2017, Wayne learned of the killing of the Incense Man.

On September 28, 2017, Wayne was in Stuff2Puff when Jackson entered the store. Jackson confided to Wayne that the police had questioned him about Ras's homicide. Jackson said they had him on video and that "the whole thing was freaking him out." Jackson told Wayne that he went from Newport Avenue to his girlfriend's house at 9:30 p.m. and "wasn't there" at the time of the murder.

14

Wayne tried to comfort Jackson and told him, "hey, as long as the cameras showed that you weren't there later when that -- when the murder occurred, you're clear. . . . as long as, you know, you didn't go back."  In response, Jackson "hung his head, . . . got a dejected look and said, yeah, but I went back."  Jackson told Wayne that Ras "was talking shit to [him]."

On September 29, 2017, Wayne reported Jackson's statements to law enforcement.  A few days later, Jackson called Wayne and asked if Wayne could find him some "brown," which Wayne explained meant Mexican brown tar heroin.  Wayne said he did not know where to find any but arranged to meet with Jackson.  Wayne told the detectives about the arrangement and they equipped him with a recording device for his meeting with Jackson.

On October 3, 2017, Wayne and Jackson met at Stuff2Puff.  Wayne recorded their conversation.  Jackson told Wayne he was "fucking scared as fucking shit" and "just was fucking taking Xanax after Xanax -- [¶] . . . [¶] -- [to] [f]ucking forget about him . . . ."

Wayne asked Jackson:  "[T]he other day when . . . you were saying that you went to . . . your girlfriend's house at 9:30" and "then you went back to the guy.  Did a fight happen?  What's going on?"  Jackson told Wayne that "[h]e"—apparently referring to Ras—"had spit on" Jackson's sister Melissa "and called her a whore and this, that, and the other."  Jackson said: "Just literally we exchanged words and I walked away.  And I was just like, you know, fuck that fuckin nigger,[7] dude.  Fuck that, fuckin n[-----] and just went back and handled it, you know."

_____

7    Jackson repeatedly used this racially offensive vulgarity when referring to Ras.  We quote Jackson accurately this time to inform the reader of Jackson's actual language.  Hereafter, rather than quote Jackson's actual use of this word, we replace it with "n[-----]."

15

Wayne prodded Jackson to explain what he meant by "[h]andle it." Jackson responded that he "fucking got into it with the guy." Wayne asked whether Jackson "punch[ed] him." Jackson responded that he "didn't touch him." Jackson said he was "sticking to [his] [a]libi" that he "was asleep at 9:30 . . . ."

Jackson told Wayne he had "seen those fucking videos dude" and they "look[ ] like me." Jackson, referring to the victim, said "[h]e was the, for a fucking n[-----], bum troll n[-----] he was fucking nice, you know."

G.   *Testimony of H.E.*[8]

1.   *Background*

In October 2017, the detectives served a search warrant seeking Jackson's phone records from June 2017. The phone records showed that Jackson and his friend, H.E., had called one another six times between 11:57 p.m. on June 21 and 12:26 p.m. on June 22.

On December 22, 2017, Detectives Siemer and Kevin Iwasaki interviewed H.E. Subsequently, H.E. testified at the preliminary hearing on August 8, 2018, gave another statement to detectives on August 12, 2018, and testified at trial in May 2019.

At trial, the prosecution requested the court to order H.E. to testify under a judicial grant of use immunity, pursuant to section 1324.[9] At a

---

[8]   We refer to this witness by initials only pursuant to Cal. Rules of Court, rule 8.90(b), which counsels that a person should be identified by initials only where doing otherwise "would defeat the objective of anonymity."

[9]   Section 1324 permits the prosecution to request the court to order a witness who may incriminate himself to testify under a judicial grant of use immunity. (Pen. Code, § 1324.) A grant of use immunity means that the prosecution may not use the witness's testimony against him in any future prosecution, except in a prosecution for perjury. (*Ibid.*)

hearing outside the presence of the jury, the court appointed H.E. a lawyer and granted the prosecution's request. When he took the witness stand at trial, H.E. testified he had appeared in court without the expectation of immunity.

      2.    *H.E.'s Trial Testimony*

In June 2017, H.E. was 18 years old and had resided in Ocean Beach "[m]ost of [his] life." He had known Jackson since middle school and considered Jackson to be one of his best friends.

On the night of June 21, 2017, H.E. got off work at Hodad's, a restaurant on Newport Avenue and Bacon Street in Ocean Beach, at around 10:30 or 11:00 p.m. After work, H.E. received a phone call from Jackson who was "panicking." Jackson told H.E. that "he had gotten into a fight with his girlfriend at a party" and asked H.E., "Would you like to go out and fuck somebody up with me?" Jackson sounded "irritated" or "frustrated." H.E. responded, "No, I'm all right. I have to go to work in the morning."

Approximately "15 to maybe 30 minutes" later, H.E. received another phone call from Jackson. Jackson was "breathing heavily" as though he had been running and sounded "panicked," as if in a "state of shock." Jackson immediately told H.E., "I just poked that n[-----]." H.E. could not understand Jackson at first and asked, "[W]hat's going on?" Jackson repeated, "I just poked that n[-----]." H.E. told Jackson "he needed to go home and get off the street." Jackson said "Okay." H.E. did not hear from Jackson again that night.

The next morning when H.E. went to work, he saw police "Do Not Cross" tape extending "across the alley and in front of the storefront." Upon seeing the crime scene, H.E. realized "this is probably what [Jackson] was talking about" when he said he "just poked that n[-----]."

17

Less than a week later, Jackson called H.E. and asked him to come over to his house to "smoke a joint with him" because Jackson was "freaking out." H.E. walked over to Makaela's house to see Jackson. Jackson, who was alone at the house, told H.E. he "couldn't take it anymore." Jackson explained that "he heard his girlfriend's parents talking about the man that was killed and how they hope they find the killer and how it was eating him alive inside."

Jackson told H.E. he had gotten into a fight with his girlfriend and "he was angry." He told H.E.: "I was walking past him and he was mumbling under his breath. And I turned around and I said, 'what, motherfucker?" Jackson said he didn't recall what "Ras said to him" and told H.E., "that's when [I] did it." Jackson was "panicked" and told H.E. that "the detectives had come over and told him that he was a person of interest."

About a week later, Jackson texted H.E. and asked him to come over to his house again. In the text message, Jackson told H.E. "[h]e wanted [H.E.] to help him get rid of the clothes" he believed he was wearing the night of Ras's homicide. When H.E. went over to Jackson's house, Jackson had "already gathered" a sweatshirt hoodie, a pair of black "Dickies" pants, a pair of "darker denim pants," a pair of black Converse shoes, and a "gray with a leather stripe pair of [V]ans" shoes in front of his closet. He told Jackson, "I'm not sure which ones they are, but those are the only ones they could possibly be."

Jackson also showed H.E. the knife. It had an approximately nine and one-half inch serrated blade and a three and one-half inch handle. It had one sharp edge and one blunt edge. Jackson said he had cleaned it but was not sure how good a job he had done. It was not the first time Jackson had shown that knife to H.E. About three weeks to a month earlier, Jackson

18

asked H.E. if he wanted "to check out" what he had. Jackson then got the knife from his room, pulled it out of the sheath, showed it to H.E. and said, "this is my new knife."

H.E. put Jackson's clothing in his backpack. He told Jackson that "we'll worry about the knife later," and left. He kept Jackson's clothes at his house for a few days and then threw them in a dumpster in a nearby park.

Around two weeks after getting rid of Jackson's clothes, H.E. helped Jackson get rid of the knife. Jackson was scared about being a person of interest and "wanted to get rid of the stuff." H.E. drove to Makaela's house and picked up Jackson with "the intent to help him get rid of the knife." They agreed the best place to dispose of it was in the ocean, so Jackson suggested they go to Kellogg Beach at Shelter Island.

H.E. drove Jackson to Kellogg Beach. Jackson got out of the car and walked to the mouth of a path leading to the beach. Less than five minutes later, Jackson got back into the car and said, "I threw it as hard as I could."[10] H.E. never saw the knife during the car ride. He drove Jackson home and told Jackson, "to be safe and careful." That was "one of the last times" H.E. spoke with Jackson.

3.    *H.E.'s Admissions*

In his interview with Detectives Siemer and Iwasaki on December 22, 2017, H.E. initially denied knowing anything about Ras's murder. He was shown photographs of the suspect from the Apple Tree Market surveillance

_____

10    In August 2018, a San Diego Harbor Police Department dive team searched for the knife in the ocean near Kellogg Beach but was unable to locate it. The dive team supervisor testified he was "[n]ot at all" surprised, given the lack of information as to the precise location where the objects had been thrown, the fact that over a year had passed since the knife was discarded, and the heavily trafficked nature of the waterways in that area.

19

video, and he claimed he could not recognize the suspect and that "it look[ed] like a blob." The detectives asked if H.E. had made a Crime Stoppers tip and H.E. claimed that he had.

The detectives told H.E., "here's the deal . . . this hasn't been the best year for you. I know you got in a little bit of trouble, right? We didn't just randomly pick you to come to talk to you." The detectives were referencing the fact that H.E. had recently been released from jail after being convicted of a misdemeanor assault involving his attack on a homeless person on June 28, 2017. At various points, the detectives made statements to H.E. that he took as "a veiled accusation" that he was "somehow involved" in Ras's murder.

The detectives made it "[p]retty clear" to H.E. that they considered Jackson to be "their number one suspect." They told H.E. that if he was trying to "cover up any little thing, . . . any phone call or something . . . it's all going to come out in the end." The detectives told H.E. they didn't want "to have something come back on [H.E. if he was] tryin[g] to cover up something."

H.E. then told the detectives a few weeks after he "got in trouble," Jackson called him "crying." H.E. went over to see Jackson at his girlfriend's house and "smoked a joint with him." Jackson told H.E. that "he was losin' it" and "can't take it no more" because his girlfriend and her parents were saying, "Oh, I hope they catch the bastard that did this." Jackson then told H.E., "I poked that n[-----]." Jackson told H.E. "he was angry so he went out and he was just . . . lookin' for something. . . .[f]or trouble, pretty much." The detectives asked H.E. if Jackson told him what he did with the knife or his clothes from the night of Ras's murder; H.E. said Jackson did not.

H.E. admitted at trial that he lied to the detectives when he denied recognizing the suspect in the surveillance photographs; he did. He also

20

admitted that he lied when he told the detectives he had made a Crime Stoppers tip; he had not. H.E. testified he lied to the detectives for several reasons. He was "scared" that his "other friends would come after [him]" for testifying against his friend. He had gotten into "trouble" himself around a week after the homicide for "an attack on a homeless person" and he did not want to incriminate himself. He had wanted to tell the detectives "the entire truth" and regretted that he did not.

H.E. testified at the preliminary hearing on August 8, 2018. At trial, H.E. admitted he had not testified to the whole truth about what happened and his involvement at the preliminary hearing. H.E. did not disclose at the preliminary hearing that he helped Jackson get rid of his clothing and the knife.

H.E. testified that he felt "like shit" when he left the courtroom after the preliminary hearing because he had not said everything he knew. He drove home from the preliminary hearing with Wayne. During the drive, H.E. confided in Wayne that he knew more about Ras's murder than he disclosed, including that he helped Jackson get rid of incriminating evidence. Wayne told H.E. he needed to provide the additional information to the detectives. Four days later, on August 12, 2018, H.E. gave another statement to the detectives. This time, H.E. revealed he had helped Jackson get rid of the knife that Jackson used to stab Ras.

He decided to tell the truth after the preliminary hearing because he had gotten older and did not "want to do bad guy stuff anymore." He "want[ed] to live [his] own life, and this is just something [he] needed to get completely put behind" and he did not "want to be in somebody else's situation." He felt that what he knew "can really help the case, and it

21

need[ed] to be said." H.E. testified that "[m]urder isn't okay . . . when you have something like that on your mind, it's hard to keep it inside . . . ."

H.E. testified he did not tell the truth at the preliminary hearing because he was "scared." He had been threatened twice for providing information to law enforcement "[b]y people out in Ocean Beach." His "name was put in the newspaper shortly after [the] preliminary hearing" and he moved out of Ocean Beach "right after" the preliminary hearing. H.E. testified that people in Ocean Beach will "pretty much beat the shit out of you" for testifying against someone they know. They would also do something called "black[ing] out their Ocean Beach," which meant to cut out or burn off the person's Ocean Beach tattoo. H.E. has an Ocean Beach tattoo.

H.      *Jackson's Recorded Jail Call*

In a recorded call from jail, Jackson told an unidentified person that he had received copies of his discovery from the criminal case. Jackson complained that H.E. was "all in my paperwork." Jackson said, "it's just a trip, dog, that [H.E.] would do it for the money, dog, because there was a reward, I guess." Jackson said someone should "blackout [H.E.'s] fucking [O]cean [B]each."

II.

*The Defense Case*

A.      *Testimony of Pierre T.*

Pierre T. was working as a bouncer for Winstons on the night of June 21, 2017. He did not witness the stabbing of Ras. Rather, he testified regarding another event he had seen on Bacon Street approximately 45 minutes to an hour before Ras's homicide.

At around 11:00 p.m., Pierre was outside Winstons and "walking around." While outside, Pierre saw "there was an altercation between

22

whoever the suspect is and Ras" and it involved "bickering back and forth and running down the street." He believed "one of the other homeless kids" was involved. Pierre then testified the "interaction that [he had] seen" only involved a "group of white guys" and that he could not "specifically say if Ras was in . . . that group."

Defense counsel showed Pierre the photographs from the Apple Tree surveillance video[11] and asked if the suspect in the photographs was "one of the persons" he saw in the argument. Pierre answered, "I can't 100 percent say from seeing the photos of the actual suspect. They match, but this suspect here in the photo is him. . . . But the suspect that I seen, the photo today didn't match the person I seen running down the street."

Defense counsel again asked Pierre if the suspect in the photographs was "the suspect" he saw at 11:00 p.m. and he answered, "for court purposes, I don't think I can say 100 percent that is him . . . ." When asked for his "level of certainty," Pierre stated, "5 or 6." When asked by the prosecutor, Pierre testified he was "not . . . close at all" to being able to confirm that the person he saw at 11:00 p.m. was the person in the Apple Tree photographs.

Pierre testified that Jackson, as he appeared in the courtroom during trial, was not the person Pierre saw on Bacon Street at 11:00 p.m.

B. *Other Defense Witnesses*

Jackson's sister, Melissa A., testified she never met Ras and has never had someone spit on her.

---

[11] The photographs shown to Pierre were taken from video footage recorded by a second camera installed at Apple Tree. While the other camera showed the parking lot, this camera showed the sidewalk on Newport Avenue immediately in front of the business. Footage from this camera captured the suspect as he walked westbound past the market.

The parties stipulated that, at approximately 8:30 a.m. on June 22, 2017, Officer Patrick Cooley recovered and booked into evidence "a light gray hood[ed]" sweatshirt that was "left on top of the newspaper box in front of" a business on Bacon Street.

A DNA criminalist with the San Diego Police Department crime laboratory analyzed the sweatshirt recovered by Officer Cooley for DNA evidence. She concluded that Jackson was excluded as a contributor to the "mixture of DNA" detected on the sweatshirt. The sweatshirt was a size small and the majority contributor of DNA detected on the sweatshirt was female.

DISCUSSION

I.

*No Error in Limitation of Cross-Examination*

Jackson contends the trial court erroneously precluded his counsel from cross-examining H.E. on the details of H.E.'s misdemeanor assault conviction, and about a purported sexual advance H.E. made on Jackson. He argues the error violated his state and federal constitutional rights to confrontation of witnesses and presentation of a defense. We address these arguments separately and conclude each lacks merit.

A. *H.E.'s Misdemeanor Assault Conviction*

1. *Additional Background*

Before jury selection, the prosecution moved in limine to exclude evidence of H.E.'s misdemeanor conviction for an assault, in violation of section 245, subdivision (a)(4), including the underlying facts, under Evidence Code section 352. The conviction stemmed from H.E.'s assault of a homeless man on June 28, 2017, wherein H.E. confronted the homeless man because he

24

was wearing a red shirt and H.E. believed that was "disrespect[ful] to the 'Hell's Angels.' "

Jackson opposed the motion. He argued the conviction was relevant and admissible to explain H.E.'s state of mind when he was questioned by the detectives on December 22, 2017, to show H.E. was afraid of going back to jail and was motivated to please the police by providing false testimony against Jackson. He also argued the conviction qualified as a crime of moral turpitude and was relevant to H.E.'s credibility.

The trial court excluded reference of the misdemeanor conviction as not relevant but ruled defense counsel would be permitted to cross-examine H.E. about any fact of H.E.'s underlying conduct in the assault if the detectives used that particular fact in questioning H.E. The court reasoned that "its relevance is what the detective said to the witness and what impact that might have had on the witness." The court indicated that if certain facts, such as the red Hells Angels shirt, were raised by the detectives, defense counsel would be permitted to ask about them. However, "[i]f the shirt was never mentioned during the interview, and that it was the Hells Angels and the colors, then it is not appropriate to inquire."

At trial, Jackson's counsel cross-examined H.E. at length and repeatedly impeached H.E. on the inconsistencies and H.E.'s admissions of his untruthfulness in his statements during the December 22, 2017 police interview, at the preliminary hearing, and at trial. When he testified at trial, H.E. admitted more than 15 times that he had lied.

Defense counsel elicited testimony from H.E. that he assaulted a homeless person. H.E. testified:

> "Q:  Is it correct that at that first interview that occurred three days before Christmas, December 22 of 2017, you were afraid

25

when the detectives talked to you because of a previous incident in which you had been involved?

"A:  Yes.

"Q:  Because that previous incident in which you had been involved -- involved an attack on a homeless person, correct?

"A:  Yes, sir."

Defense counsel further elicited testimony from H.E. that the detectives used the fact of his assault on a homeless person in their questioning of him and that caused H.E. to feel afraid and intimidated.  H.E. testified:

"Q:  [The detective] said, 'I'll be honest with you, just as an outsider looking in, so far, you've been cooperative and everything.  And I'm taking you at your word, but as an outsider looking in, you have a homeless guy who's killed, a key person of interest, our probably number one suspect is a buddy of yours.' [¶] Do you remember that?

"A:  Yes.

"Q:  And you acknowledged what [the detective] said throughout by saying, 'Yeah, yeah'?

"A:  Yes.

"Q:  Then [the detective] says, . . .'Three days after this homeless guy's killed, you're involved in an incident where a homeless guy is either, I know that you have your side to that story how that went down, but you're involved in what ends up being considered a robbery of a homeless guy.' [¶] [The detective] said that you?

"A:  Yes.

"Q:    And when you heard that, you understood that he was suggesting that what you had been involved in was, to his mind, similar to the homicide?

"A:    Yes."

H.E. admitted the detectives made him feel "afraid" and "intimidated." Defense counsel elicited from H.E. that he "had just gotten out of jail" at the time he spoke to detectives on December 22, 2017, and he "did not want to go back."

Defense counsel also established that the detectives had told H.E. their investigation of the murder was not finished, and that H.E. surmised from this statement that any further investigation might involve him. H.E. agreed with defense counsel that he understood during the interview that "[the detectives] wanted [H.E.] to say something incriminating about [Jackson]."

2.    *Analysis*

Jackson argues the restrictions the trial court placed on his counsel's cross-examination of H.E. violated his state and federal constitutional rights to confront witnesses and to present a defense. He appears to contend the violations arose from the court's refusal to allow his counsel to question H.E. about the fact that H.E. "was so upset over a homeless man wearing a Hells Angels shirt that he felt compelled to assault the man and steal the shirt."

A defendant's right to be confronted by the witnesses against him and to present a defense are guaranteed by the federal and California Constitutions. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, §§ 15, 24.) However, the right to cross-examination of witnesses is not unlimited. (*People v. Sully* (1991) 53 Cal.3d 1195, 1219.) "[N]ot every restriction on a defendant's desired method of cross-examination is a constitutional violation." (*People v. Chatman* (2006) 38 Cal.4th 344, 372 (*Chatman*).)

27

"Although the right of confrontation includes the right to cross-examine adverse witnesses on matters reflecting on their credibility, 'trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination.' " (*People v. Quartermain* (1997) 16 Cal.4th 600, 623 (*Quartermain*), quoting *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679 (*Van Arsdall*); accord *Chatman, supra,* 38 Cal.4th at p. 372.) "In particular, notwithstanding the confrontation clause, a trial court may restrict cross-examination of an adverse witness on the grounds stated in Evidence Code section 352." (*Quartermain, supra,* 16 Cal.4th at p. 623; see *People v. Hovarter* (2008) 44 Cal.4th 983, 1010 (*Hovarter*) ["The 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights.' "].)

Trial courts have broad discretion to impose reasonable limits on cross examination "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." (*Van Arsdall, supra,* 475 U.S. at p. 679; see *People v. Pearson* (2013) 56 Cal.4th 393, 454 (*Pearson*) ["trial courts have broad discretion ' "to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues . . . ." ' "].) A trial court's discretionary decision under Evidence Code section 352 " 'to exclude evidence of marginal impeachment value that would entail the undue consumption of time generally does not contravene a defendant's constitutional rights to confrontation and cross-examination.' " (*Pearson, supra,* 56 Cal.4th at p. 455.)

Moreover, "[a] trial court's limitation on cross-examination pertaining to the credibility of a witness does not violate the confrontation clause unless a reasonable jury might have received a significantly different impression of

the witness's credibility had the excluded cross-examination been permitted." (*Quartermain, supra,* 16 Cal.4th at pp. 623–624; accord *People v. Whisenhunt* (2008) 44 Cal.4th 174, 208 (*Whisenhunt)*.)  Thus, "unless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witnesses'] credibility' (*Van Arsdall, supra,* 475 U.S. at p. 680), the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment."  (*Chatman, supra,* 38 Cal.4th at p. 372.)

The People first contend Jackson forfeited his constitutional challenge by failing to object on constitutional grounds in the trial court.  We disagree. " '[A]s a general matter, no useful purpose is served by declining to consider on appeal a claim that merely restates, under alternative legal principles, a claim otherwise identical to one that was properly preserved by a timely motion that called upon the trial court to consider the same facts and to apply a legal standard similar to that which would also determine the claim raised on appeal.' " (*People v. Partida* (2005) 37 Cal.4th 428, 436 (*Partida*), quoting *People v. Yeoman* (2003) 31 Cal.4th 93, 117.)

Thus, where a defendant asserts an objection to particular evidence on state law grounds at trial but fails to assert a constitutional violation, the state law objection will preserve a "narrow" constitutional challenge to admission of the evidence.  (*Partida, supra,* 37 Cal.4th at p. 435.)  Jackson argued at trial that evidence of the facts of H.E.'s misdemeanor offense was relevant to H.E.'s credibility and his bias against Jackson and motive to lie. Under *Partida,* Jackson may argue for the first time on appeal that the court's asserted error in declining to allow questioning about the details of the assault had the "additional legal consequence" of violating his due process and confrontation clause rights.  (*Ibid.*)

29

We conclude, however, that no constitutional violation occurred. Jackson elicited most of the details of H.E.'s assault. The jury was informed that, "[t]hree days after" Ras was killed, H.E. had "attack[ed]" and committed "a robbery of a homeless guy." The jury was also informed that H.E. served time in jail for the offense. Further, the jury heard H.E. admit that the fact of his offense and the use of it by the detectives influenced him during his police interview. He admitted he lied to the detectives out of fear he would be perceived as the perpetrator. He acknowledged he was afraid of going back to jail and had told the detectives what he thought they wanted to hear.

To the extent Jackson argues he should have been permitted to elicit the additional detail that H.E. assaulted the homeless person because the person was wearing a Hells Angels shirt, we conclude that additional information would not have given the jury a significantly different impression of H.E.'s credibility. And to the extent that Jackson argues the jury should have further heard H.E. suffered a misdemeanor conviction as a result of his assault, we conclude the trial court properly excluded that fact. Under *People v. Wheeler* (1992) 4 Cal.4th 284, evidence of a misdemeanor conviction is inadmissible hearsay when offered to impeach a witness's credibility. (*Id.* at p. 300; see 3 Witkin, Cal. Evidence (5th ed. 2020) § 306, p. 429.)[12]

Finally, we do not perceive a due process violation. Although Jackson asserts that his right to present a defense was violated, he fails to elaborate or present separate argument in support of this constitutional claim. We need not further address Jackson's boilerplate assertion of a due process violation. (*Hovarter*, *supra*, 44 Cal.4th at p. 1010 ["As defendant provides no

---

[12] At oral argument, Jackson's counsel argued for the first time that certain additional purported facts of the offense were also improperly excluded from the scope of cross-examination. On examining the record, we see no indication these allegations were ever proven.

elaboration or separate argument for these constitutional claims, we decline to address further these boilerplate contentions."].) Moreover, even if Jackson had not forfeited this claim due to his deficient briefing, we would reject it. The " 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights.' " (*Ibid.*; *Partida, supra*, 37 Cal.4th at p. 439 ["[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*."].) The limitation the court placed on defense counsel's questioning qualified as a routine and appropriate exercise of its discretion under Evidence Code section 352 and did not make Jackson's trial fundamentally unfair.

B.   *The Alleged Sexual Advance*

1.   *Additional Background*

At trial, in the middle of his cross-examination of H.E. and out of the jury's presence, defense counsel sought to question H.E. about a sexual advance H.E. had purportedly made on Jackson during the summer of 2017. Defense counsel claimed the advance had been upsetting to Jackson and that Jackson "let [H.E.] know that, and there was some riff between the two as a result of it." Counsel indicated he wanted to question H.E. about this incident to show H.E. was biased against Jackson "because his sexual overture was rejected." Defense counsel also informed the court the defense had received a "download" from H.E.'s cell phone that showed H.E. had made sexual "overtures to both men and women on the internet" and that he was "sexually omnivorous."

The prosecutor objected, responding that there was no evidence of H.E.'s alleged bisexuality other than the phone data, and no evidence of anything "targeted at Mr. Jackson." He noted that at the preliminary hearing, defense counsel had asked H.E. about the alleged sexual advance

31

and H.E. denied it. The prosecutor argued there was no indication of hostility between the two men arising from any alleged rejected sexual advance. He argued that even Jackson believed H.E.'s motive to testify against him was financial, not any purported rebuffed sexual advance, because Jackson stated in a recorded jail call that H.E. "must have done it for the money." Finally, the prosecutor argued that H.E.'s alleged sexual orientation had no tendency to show that he would have "frame[d] Mr. Jackson for murder."

Defense counsel responded that "it is not [H.E.'s sexual] orientation as a general matter" that was relevant but "the fact that he made an overture" to Jackson. The court asked defense counsel, "the question is can you impeach [H.E.] if he denies it?" Defense counsel responded, "[w]ell, if he says no, I would never do such a thing, I can definitely impeach him with the various emails he sent to men on the internet."

The court ruled that "[o]n a 352 analysis, I will not allow inquiry into that" and that on balance, "it is not probative and it is potentially prejudicial, unfortunately, in this day and age, still."

2. *Analysis*

Jackson contends his confrontation and due process rights were violated by the trial court's refusal to allow his counsel to ask H.E. about the allegedly rejected sexual advance.

The People respond that defense counsel's offer of proof at trial was insufficient to preserve the issue for appeal. The People further argue that evidence of the alleged encounter, even if it existed, would not have produced a significantly different impression of H.E.'s credibility. We agree.

We first conclude that Jackson's counsel's offer of proof was inadequate to preserve a claim of error arising from the court's decision to preclude him

from cross-examining H.E. about the alleged sexual advance rejected by Jackson. "If the evidence the defendant seeks to elicit on cross-examination is not within the scope of the direct examination, an offer of proof is required to preserve the issue." (*People v. Foss* (2007) 155 Cal.App.4th 113, 127 (*Foss*).) The offer of proof " 'must set forth the actual evidence to be produced and not merely the facts or issues to be addressed and argued. [Citations.]' " (*Id.* at p. 128, quoting *People v. Schmies* (1996) 44 Cal.App.4th 38, 53.) " 'The offer of proof serves to inform the appellate court of the nature of the evidence that the trial court refused to receive in evidence . . . . The function of an offer of proof is to lay an adequate record for appellate review . . . .' " (*Nienhouse v. Superior Court* (1996) 42 Cal.App.4th 83, 93–94.) An offer of proof that is conclusory or that only addresses the area of questioning will be deemed insufficient to preserve the issue for appeal. (*Foss*, *supra*, 155 Cal.App.4th at p. 128.)

Here, defense counsel's proposed questions about the alleged rejected sexual advance were not within the scope of H.E.'s direct examination. And yet defense counsel provided no indication that evidence of a sexual advance on Jackson, Jackson's refusal of that advance, or resulting hostility between Jackson and H.E., would be elicited in response to his questioning. The only evidence defense counsel was able to proffer was the phone data purportedly indicating H.E. had made sexual overtures to *other* men and women on the internet. As defense counsel acknowledged, however, H.E.'s sexual orientation was not relevant to establishing alleged hostility toward Jackson

33

or motive to lie.[13] Apart from the phone data, the remainder of defense counsel's proffer merely focused on the lines of questioning he wanted to pursue. Accordingly, defense counsel's offer of proof was inadequate to preserve the issue for appeal. (See *Foss*, *supra*, 155 Cal.App.4th at pp. 123, 127–128 [holding a defense offer of proof that a child molestation victim's mother expressed concern to the victim about finding child pornography on defendant's computer, and asked the victim if she had been molested, insufficient because it did not "give a specific offer of proof of evidence to be produced"].)

Moreover, even if we assume for the sake of argument that this claim of error was properly preserved, we would still find no violation of Jackson's right of confrontation. Jackson contends the evidence of his rejection of H.E. would have established that H.E. had a motive to lie about Jackson's culpability. However, as we have discussed, H.E.'s credibility was amply explored at trial. The inference that any riff arising from an allegedly

---

[13] Jackson requested transmittal to this court of a defense exhibit filed under seal in support of his new trial motion. The exhibit purportedly relates to Harrison's cell phone data. Jackson states we should consider this exhibit in determining whether the trial court erred in precluding his counsel from asking Harrison about the alleged sexual advance. We decline to do so. One of the general principles of appellate law is that we review "only those matters which were before the lower court when it made its decision." (*Ramis v. Superior Court* (1977) 74 Cal.App.3d 325, 332.) An appellate court must assess a trial court's evidentiary ruling "based on the facts made known to the court when it was asked to make the ruling." (*People v. Hartsch* (2010) 49 Cal.4th 472, 491; *People v. Hernandez* (1999) 71 Cal.App.4th 417, 425 (*Hernandez*).) "To do otherwise would require us to hold the trial court to an impossible standard." (*Hernandez*, at p. 425.) Jackson provides no indication the trial court had the benefit of this exhibit at trial. Since this evidence was not before the court at the time it ruled, we cannot rely on it to evaluate the validity of the court's ruling.

rejected sexual advance was so serious as to bias H.E. against Jackson was undermined by Jackson's recorded call from jail in March of 2018, during which he surmised that H.E.'s incentive for incriminating Jackson was a financial reward and did not mention the purported interpersonal conflict or sexual rejection as a possible motivation. The additional impeachment value of the excluded evidence was minimal in relation to the areas of impeachment already raised by the admitted evidence. (See, e.g., *Whisenhunt, supra* 44 Cal.4th at pp. 207–208 [upholding trial court's decision excluding testimony concerning alleged affairs on the ground its impeachment value was "minimal in relation to the major areas of impeachment already raised by the admitted evidence"].) A reasonable jury would not have received a significantly different impression of H.E.'s credibility even if the proffered evidence had been admitted.

As we have noted, Jackson's due process claim is unelaborated and is thus insufficient to demonstrate error. (*Hovarter*, *supra*, 44 Cal.4th at p. 1010 ["As defendant provides no elaboration or separate argument for these constitutional claims, we decline to address further these boilerplate contentions."].)

Because we conclude no error arose from the trial court's rulings limiting the scope of defense counsel's cross-examination, we need not and do not address whether any such errors were harmless under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (See *Van Arsdall, supra*, 475 U.S. at p. 684 [holding that "the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman* harmless-error analysis"].)

## II.

### *No Error in Exclusion of Third Party Culpability Evidence*

A.    *Additional Background*

In another motion in limine, the prosecution sought to preclude Jackson from introducing third party culpability evidence.  The prosecutor explained that law enforcement had investigated any person mentioned in a Crime Stoppers tip or suggested by a citizen in response to released photographs of the suspect, but had found no evidence connecting such individuals to the homicide.  Jackson opposed the motion, and sought to introduce evidence of third party culpability as to three individuals: Matthew A., Nathan C., and Michael T.[14]

The trial court heard arguments on third party culpability on two separate days before trial.  In support of his request to admit such evidence, Jackson filed under seal the booking records, including booking photographs, of Matthew, Nathan, Michael, and a report of a call to Crime Stoppers regarding Michael on June 25, 2017.  At the hearing, Defense counsel stated he intended to present the booking photographs at trial and compare them to the images of the suspect in the Crime Stoppers flyer.

First, as to Matthew, Jackson proffered he was a homeless man known to frequent the area where the homicide occurred and who had allegedly been detained on June 10, 2017, for threatening passersby with a knife.  Defense counsel proffered that Pierre, the bouncer at Winstons, would testify that

---

[14]    Jackson sought to introduce evidence as to a fourth unidentified male and proffered that, "[i]n late 2017, staff at Hodad's caught a man trying to steal from the employee tip jar" and "[p]eople believed that the accused thief resembled the murder suspect."  The trial court excluded the proffered evidence of this fourth alternate suspect, but Jackson does not appeal this ruling.

Matthew was at the scene of the crime with a knife an hour before the homicide.  Defense counsel further elaborated that Pierre and another witness would establish that Matthew had confronted a "group" at 11:00 p.m. in front of Winstons, and he would argue from this evidence that Matthew left the location, returned with a knife, and took revenge on Ras.

Second, as to Nathan, Jackson proffered that a witness interviewed by detectives had stated Nathan resembled the surveillance footage of the suspect, and that Nathan was "crazy, mad, and addicted to drugs" and had frequented "the Ocean Beach area" during the summer of 2017.  Defense counsel noted that booking records showed that Nathan had been detained or arrested in May 2017 for causing a violent disturbance and for battery, and that the offense occurred one block from the location of the homicide.

Third, as to Michael, Jackson proffered that an anonymous informant had reported that he or she recognized Michael based on the surveillance footage of the suspect, and that Michael lived "nearby" in Ocean Beach.  Defense counsel asserted that booking records showed Michael had "a long criminal history," including convictions for assault with a deadly weapon.  Defense counsel argued that Michael's similarity in appearance to the suspect, residence in the neighborhood of the homicide, and "violent criminal history" made him a suspect of the homicide.

Defense counsel also asserted there was a detective's note indicating that a "witness had said something to the effect of I know that [Michael] had had an argument with the decedent."  The trial court asked, "what's the basis of knowledge of that person's belief?  And when did this apparent argument occur in relationship to the homicide?"  Defense counsel responded that he did not know but was "reaching out to try to speak to that person."

37

On the subject of Michael's similarity in appearance to the suspect, the trial judge informed the parties he was familiar with Michael, having had "both Michael . . . and his identical twin brother for extended periods of time" appear before him in another case, and knew Michael to have a tattoo on his neck. The judge then said to defense counsel, "if the argument is based in a significant degree on the similarity and [*sic*] appearance, that's difficult to make, especially with the tattoo." Defense counsel responded, "[s]o to my mind, appearance is the most important thing. So if Your Honor's finding, based on a review of the factual submission, is no, that is not physically similar, then I have nothing further to argue." Defense counsel then stated that Michael's tattoo was "on the left-hand side of the neck," and the left side of the suspect's neck was not visible in any surveillance video. The judge agreed on the placement of Michael's tattoo but noted that "no witnesses said the stabber had a tattoo on the neck."

At the conclusion of the attorney's arguments, the trial court excluded the proffered evidence as to Michael and Nathan, stating it did not "see any basis for third party culpability" as to these persons. The court reserved its decision as to Matthew until it heard the evidence at trial, but tentatively ruled there was "an insufficient nexus of relevant evidence" of his alleged culpability. At trial, before the defense rested its case, Jackson withdrew his request to introduce the evidence as to Matthew but renewed his request to admit evidence regarding Michael and Nathan, without additional argument.

The trial court confirmed its ruling to exclude evidence as to Michael and Nathan, stating that "listening to the evidence doesn't change the argument and the analysis," and confirmed that Jackson was "withdrawing the request to have Matthew . . . presented to the jury as a third party culpability suspect." Defense counsel responded, "That is correct."

38

B.    *Analysis*

Jackson argues the trial court violated his constitutional right to present a defense when it precluded him from presenting evidence of other individuals' culpability for the homicide.  We conclude the claim has no merit.

1.    *Any Assertion of Error as to Excluded Evidence of Matthew Is Forfeited*

As a preliminary matter, we conclude that Jackson has forfeited any claim of error arising from the trial court's "tentative" exclusion of evidence relating to Matthew as a culpable third party.  Jackson expressly withdrew his request to admit evidence of Matthew's culpability before the court ruled on the matter.  He has, therefore, forfeited any contention that the failure to admit evidence of Matthew's culpability was attributable to an erroneous ruling from the court.  " '[F]ailure to press for a ruling on a motion to exclude evidence forfeits appellate review of the claim because such failure deprives the trial court of the opportunity to correct potential error in the first instance.' " (*People v. Valdez* (2012) 55 Cal.4th 82, 143; see *People v. Morris* (1991) 53 Cal.3d 152, 195 [defendant forfeited appellate challenge to admission of testimony by failing "to press for" a ruling "until he obtained one"], disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)

2.    *The Court Did Not Err in Excluding Evidence Relating to Michael and Nathan*

Next, we consider the trial court's decision to exclude the proffered evidence relating to Michael and Nathan.  The court found an insufficient connection between the proffered evidence and Ras's homicide.

For third party culpability evidence to be admissible, " 'there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' " (*People v. Avila* (2006) 38 Cal.4th 491, 578

39

(*Avila*), quoting *People v. Hall* (1986) 41 Cal.3d 826, 833 (*Hall*).) "[E]vidence that another person had a motive or opportunity to commit the crime, without more, is irrelevant because it does not raise a reasonable doubt about a defendant's guilt: to be relevant, the evidence must link this third person to the actual commission of the crime." (*People v. Brady* (2010) 50 Cal.4th 547, 558 (*Brady*).)

The trial court's rulings on the relevance and admissibility of evidence are reviewed for an abuse of discretion.[15] (*Brady, supra*, 50 Cal.4th at p. 558; accord *Avila, supra*, 38 Cal.4th at p. 578.) Our high court has "repeatedly upheld the exclusion of third party culpability evidence when the third party's link to a crime is tenuous or speculative." (*Turner, supra*, 10

---

[15] Jackson acknowledges that exclusion of third party culpability evidence is reviewed for an abuse of discretion. However, citing two cases, *Thompson v. Keohane* (1995) 516 U.S. 99, 111 (*Thompson*) and *People v. Cromer* (2001) 24 Cal.4th 889, 895 (*Cromer*), Jackson argues that because he claims the evidentiary ruling violated his constitutional rights, our review should be independent. We disagree that the cited authorities support Jackson's position. *Thompson* held that a custody determination for purposes of *Miranda v. Arizona* (1966) 384 U.S. 436 is a mixed question of law and fact requiring independent review by a federal court presented with a writ of habeas corpus under 28 U.S.C. § 2254. (*Thompson, supra*, 516 U.S. at pp. 112–116.) In *Cromer*, our high court held that whether reasonable diligence was used to obtain the presence of an absent witness at trial for purposes of admitting recorded testimony was a mixed question of law and fact subject to independent review under *Thompson*. (*Cromer, supra*, 24 Cal.4th at pp. 894–903.) Neither of these cases stands for the proposition that a trial court's evidentiary ruling excluding third party culpability evidence is reviewed independently where it implicates a constitutional right. As recently as *People v. Turner* (2020) 10 Cal.5th 786, 815–818 (*Turner*), our high court reviewed the exclusion of third party culpability evidence at trial for an abuse of discretion, notwithstanding that the defendant asserted the error was of constitutional dimension. Jackson does not provide a basis for avoiding this controlling authority.

Cal.5th at p. 817, citing *People v. Page* (2008) 44 Cal.4th 1, 38–39 *(Page)*, *People v. Lewis* (2001) 26 Cal.4th 334, 373, and *People v. Alcala* (1992) 4 Cal.4th 742, 792–793.)

Here, Jackson's appellate briefing is inadequate and fails to establish an abuse of discretion.  He merely asserts in perfunctory fashion that "[t]he evidence in [his] case was neither too speculative nor too remote, as will be explained" and that "[t]he evidence" "was highly relevant, created a reasonable doubt, and was not unduly prejudicial, speculative, time consuming or confusing."  His most detailed argument is that the "other suspects . . . fit the description as well or better than [Jackson] did of the suspect, . . . were known around Ocean Beach as people who committed gratuitous acts of violence, and . . . were turned in to police by people who knew them and suspected them" of the murder.  However, these assertions are unaccompanied by citations to the record.

"Mere suggestions of error without supporting argument or authority other than general abstract principles do not properly present grounds for appellate review."  (*Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2002) 100 Cal.App.4th 1066, 1078.) Arguments that are "unsupported by 'adequate factual or legal analysis' " on appeal are forfeited.  (*Singh v. Lipworth* (2014)  227 Cal.App.4th 813, 817.) Likewise, an appellant that fails to cite the record forfeits the issue or argument on appeal that is presented without the record reference.  (*City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239; *Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 768 ["[I]t is counsel's duty to point out portions of the record that support the position taken on appeal.  The appellate court is not required to search the record on its own seeking error."].)  Jackson's arguments fall short of these standards, and as a result,

41

his claim of error arising from the exclusion of third party culpability evidence is forfeited.

Moreover, even if not forfeited, Jackson's contentions lack merit. The evidence proffered by the defense did not link Michael or Nathan "to the actual perpetration of the crime." (*Hall*, *supra*, 41 Cal.3d at p. 833.) Michael reportedly resided in Ocean Beach, was similar in appearance to the suspect, and had a criminal record that included assault with a deadly weapon. However, "[e]vidence of a third party's prior crimes is inadmissible to establish the third party's criminal propensity." (*People v. Elliott* (2012) 53 Cal.4th 535, 580 (*Elliott*).) No admissible evidence actually linking Michael to the homicide was identified.[16]

The court disagreed with the position that Michael was physically similar to the suspect, a conclusion Jackson did not specifically dispute in the trial court and has not disputed on appeal. Even if there was a resemblance, that fact plus Michael's purported local residence did not actually link him to Ras's murder. (See *Brady*, *supra*, 50 Cal.4th at p. 558 [reasoning that although eyewitness accounts described the perpetrator of a police murder as an Asian male, together with a clue referring to an Asian male who had killed two members of a nearby police department, which "might have suggested some involvement" of the Asian male in the murder at issue, there

---

[16] Jackson does not argue that the detective's note about a witness report of an argument between Michael and Ras was admissible evidence, nor do we perceive that it was. Defense counsel had not spoken to the witness and was unable to confirm the basis of the witness's knowledge, nor did counsel identify a means for overcoming the hearsay problems associated with the proposed evidence. We find no abuse of discretion based on this tenuous offer of proof. (See *People v. Huggins* (1986) 182 Cal.App.3d 828, 833 ["*Hall* did not undertake to repeal the Evidence Code. Incompetent hearsay is as inadmissible as it always was."].)

was no abuse of discretion in excluding the proffered evidence, because "defendant presented no evidence actually linking this person" to the murder].)

The proffered evidence of Nathan's alleged culpability was similarly deficient. The defense indicated that a witness believed Nathan resembled the surveillance footage of the suspect, frequented the Ocean Beach area, and had a recent history of being detained or arrested for acts of violence. Again, however, evidence of Nathan's prior criminal conduct was inadmissible to establish his criminal propensity. (*Elliott, supra*, 53 Cal.4th at p. 580.) Even assuming it is true that Nathan resembled the suspect and spent time in Ocean Beach during the summer of 2017, this evidence did not connect Nathan to the actual perpetration of the offense. (*Hall, supra*, 41 Cal.3d at p. 833; *Brady, supra*, 50 Cal.4th at p. 558.)

Accordingly, the trial court did not abuse its discretion in excluding Jackson's third party culpability evidence. The trial court's decision to exclude the proffered evidence was an appropriate exercise of its discretion to exclude irrelevant evidence, and therefore did not violate Jackson's constitutional rights. "As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense." (*Hall, supra*, 41 Cal.3d at p. 834; accord *Turner, supra*, 10 Cal.5th at p. 818.) "Although a defendant is constitutionally entitled to present 'a complete defense' [citation], that right does not encompass the ability to present evidence unfettered by evidentiary rules [citation]." (*People v. Shorts* (2017) 9 Cal.App.5th 350, 358 (*Shorts*).)

Instead, "the Constitution permits judges 'to exclude evidence that is "repetitive . . . , only marginally relevant" or poses an undue risk of "harassment, prejudice, [or] confusion of the issues." ' " (*Holmes v. South*

*Carolina* (2006) 547 U.S. 319, 326–327 (*Holmes*).) "A specific application of this principle is found in rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged." (*Id.* at p. 327.) "When a trial court exercises its discretion to exclude evidence and does not abuse that discretion, the exclusion of the evidence (including proffered third party culpability evidence) does not impermissibly infringe on a defendant's federal constitutional rights." (*Shorts, supra*, 9 Cal.App.5th at pp. 358–359.) Here, the court's ruling was based on routine application of the rules relating to the relevance of third party culpability evidence and did not result in a constitutional violation.

Jackson intimates that the trial court's ruling ran afoul of *Holmes*, which "found a federal constitutional violation resulting from a rule of evidence that precluded the defendant from introducing third party culpability evidence when there is strong evidence of the defendant's guilt." (*Page, supra,* 44 Cal.4th at p. 37, fn. 16, discussing *Holmes, supra*, 547 U.S. 319.) We disagree. The trial court's ruling was based not on the perceived strength of the prosecution's case but on the lack of a sufficient basis connecting the third parties with the commission of the murder. "The court's reasonable application of the rules of evidence to exclude irrelevant and potentially misleading information did not deprive [Jackson] of his constitutional rights." (*Turner, supra*, 10 Cal.5th at p. 818.)

Because we conclude no constitutional violation arose from the court's decision to exclude evidence of Michael and Nathan's culpability, we need not and do not address whether the alleged error was prejudicial.

44

## III.

### *No Instructional Error*

The trial court refused Jackson's request to instruct the jury with CALCRIM 570 on the lesser included offense of voluntary manslaughter committed in a sudden quarrel or heat of passion. Jackson contends the court's refusal to give the instruction violated his state and federal constitutional rights to due process and trial by jury and requires reversal. We find no instructional error by the court and, therefore, no violation of Jackson's constitutional rights.

" ' "[I]n criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).) "This obligation includes giving instructions on lesser included offenses when the evidence raises a question whether all the elements of the charged offense were present, but not when there is no evidence the offense was less than that charged." (*People v. Moye* (2009) 47 Cal.4th 537, 548 (*Moye*).) "The trial court must so instruct even when, as a matter of trial tactics, a defendant not only fails to request the instruction, but expressly objects to its being given." (*Ibid.*)

"A trial court must instruct on a lesser included offense if substantial evidence exists indicating that the defendant is guilty only of the lesser offense." (*People v. Manriquez* (2005) 37 Cal.4th 547, 584 (*Manriquez*).) "As [the California Supreme Court's] prior decisions explain, the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." (*Breverman*, *supra*, 19 Cal.4th at p. 162.)

45

" 'Substantial evidence' in this context is " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]' " that the lesser offense, but not the greater, was committed.' " (*Ibid*.) "[S]ubstantial evidence to support instructions on a lesser included offense may exist even in the face of inconsistencies presented by the defense itself." (*Id*. at pp. 162–163.) "In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury." (*Id*. at p. 162.) Rather, the evidentiary support for a heat of passion instruction is considered in the light most favorable to the accused. (See *Manriquez*, *supra*, 37 Cal.4th at p. 585; *People v. Wright* (2015) 242 Cal.App.4th 1461, 1483 (*Wright*).)

" 'Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of . . . voluntary manslaughter. (§ 192.)' [Citation.] Generally, the intent to unlawfully kill constitutes malice. [Citations.] 'But a defendant who intentionally and unlawfully kills lacks malice . . . in limited, explicitly defined circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or when the defendant kills in "unreasonable self-defense"— the unreasonable but good faith belief in having to act in self-defense [citations].' [Citation.] Because heat of passion and unreasonable self-defense reduce an intentional, unlawful killing from murder to voluntary manslaughter by *negating the element of malice* that *otherwise inheres* in such a homicide [citation], voluntary manslaughter of these two forms is considered a lesser necessarily included offense of intentional murder [citation]." (*Breverman*, *supra*, 19 Cal.4th at pp. 153–154.)

"A heat of passion theory of manslaughter has both an objective and a subjective component." (*Moye, supra*, 47 Cal.4th at p. 549.) " ' "To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.' " ' " (*Ibid.*) "The provocation must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment. Adequate provocation and heat of passion must be affirmatively demonstrated." (*People v. Lee* (1999) 20 Cal.4th 47, 60 (*Lee*).) "The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*Moye, supra*, 47 Cal.4th at p. 550.)

"The defendant must [also] actually, subjectively, kill under the heat of passion." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1143.) "To satisfy the subjective element of this form of voluntary manslaughter, the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation." (*Moye, supra*, 47 Cal.4th at p. 550.) " 'Heat of passion arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' " (*Ibid.*) " 'However, if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter . . . .' " (*Breverman, supra*, 19 Cal.4th at p. 163.)

Here, although Jackson's defense at trial was that he did not kill Ras, Jackson contends the jury should have been instructed on voluntary

47

manslaughter because one of several possible scenarios in the prosecution's case supported the conclusion that he killed Ras in the heat of passion.

First, Jackson argues there was evidence that he "acted out of passion after fighting with his girlfriend. He was so upset that he cried uncontrollably, threatened suicide, threw himself on the ground and was inconsolable." He asserts, "[f]rom this, the jury could find that [Jackson] killed [Ras] in the heat of passion." This argument lacks merit, however, because it ignores the requirement that any heat of passion must have been both objectively reasonable *and* either incited by the victim, or by conduct the defendant reasonably associates with the victim. While Jackson states in his appellate brief that he is "unaware of any legal requirement . . . that the victim must be the one who aroused the passion," it is well established law that "[t]he provocation which incites the defendant to homicidal conduct in the heat of passion *must be caused by the victim* [citation], or be conduct reasonably believed by the defendant to have been *engaged in by the victim*." (*Lee*, *supra*, 20 Cal.4th at p. 59, italics added; see *People v. Steele* (2002) 27 Cal.4th 1230, 1253 [evidence defendant was a Vietnam veteran with post-traumatic stress disorder and " 'snapped' " and killed the decedent when he heard helicopters failed to satisfy the objective element of heat of passion, "which requires provocation by the victim"].)

Second, Jackson argues a voluntary manslaughter instruction should have been given because H.E. testified that Jackson said "he had a verbal exchange with [Ras], who said something to him that caused him to stab [Ras]." Not so. H.E.'s testimony was that "[Jackson] said, 'I was walking past him and [Ras] was mumbling under his breath. And I turned around and I said, "what, motherfucker?" ' [¶] And he said that the dude looked up

48

at him, and I don't recall what he said, Ras said to him, but he said that's when he did it."

This evidence failed to satisfy the objective element of a heat of passion theory of voluntary manslaughter. Although words alone may constitute adequate provocation *(Lee, supra*, 20 Cal.4th at p. 59; accord *Moye, supra*, 47 Cal.4th at p. 550), H.E.'s testimony fails to demonstrate that Jackson's response was objectively reasonable. Even if Jackson's statement, "what, motherfucker," arguably conveys that Ras's mumbling caused Jackson to become subjectively impassioned, mumbling under one's breath is not, objectively speaking, an inciting act. (*Lee, supra*, 20 Cal.4th at p. 60.) The required " ' " 'heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances,' because '*no defendant may set up his own standard of conduct* and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.' " ' " (*People v. Rogers* (2009) 46 Cal.4th 1136, 1168, italics added.)

H.E.'s testimony failed to convey what, if anything, Ras said to Jackson, and provided no indication that Ras's words were sufficient to "cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*Moye, supra*, 47 Cal.4th at p. 550.) Accordingly, H.E.'s testimony was not supportive of a heat of passion theory of voluntary manslaughter.

Finally, Jackson argues that Wayne's testimony that Jackson said he "got into it" with Ras because Ras spat on his sister and called her a "whore" was substantial evidence that the homicide was committed under heat of passion. Their full exchange was as follows:

49

"[WAYNE]:   What did he say to your sister?

"JACKSON:  He had spit on her and shit like that and called her a whore and this, that, and the other.  (Unintelligible.) [¶]

"JACKSON:  Um, but yeah, dude, it was just.  Just literally we exchanged words and I walked away.  And I was just like, you know, fuck that fuckin n[-----], dude.  Fuck that, fuckin n[-----] and just went back and handled it, you know.

"[WAYNE]:   Handle it.

"JACKSON:   Just fucking, I don't know.

"[WAYNE]:    You can talk to me, son, nothing you say is going to bother me.

"JACKSON:  Yeah, I just fucking got into it with the guy, I don't know.

"[WAYNE]:   Did you punch him?

"JACKSON:  No, I didn't, didn't touch him."

We conclude this evidence, even when viewed in the light most favorable to Jackson (*Wright*, *supra*, 242 Cal.App.4th at p. 1483), failed to satisfy the elements of voluntary manslaughter committed in the heat of passion.

" 'Heat of passion arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." [Citations.]' " (*People v. Hach* (2009) 176 Cal.App.4th 1450, 1458 (*Hach*), quoting *People v. Barton* (1995) 12 Cal.4th 186, 201 (*Barton*).) " '[T]he killing must be "upon a sudden quarrel or heat of passion" (§ 192);

50

that is, "suddenly as a response to provocation, and not belatedly as revenge or punishment.  Hence, the rule is that, if sufficient time has ela[ps]ed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter." ' " (*Hach*, *supra*, 176 Cal.App.4th at p. 1458, quoting *People v. Daniels* (1991) 52 Cal.3d 815, 868.)  Moreover, "[a]dequate provocation and heat of passion must be affirmatively demonstrated." (*Lee, supra*, 20 Cal.4th at p. 60.)

Although calling Jackson's sister a whore and spitting on her may have qualified as potential provocation, there was an absence of evidence establishing a temporal connection between the allegedly provocative event and Jackson's assault.  " '[T]he assailant must act under the smart of that sudden quarrel or heat of passion.' " (*People v. Wickersham* (1982) 32 Cal.3d 307, 327, disapproved on another ground in *Barton*, *supra*, 12 Cal.4th at p. 201.)  Jackson asserted that Ras "*had*"—past tense—"spit on [his sister] and shit like that and called her a whore and this, that, and the other."  No evidence was presented indicating that Jackson's sister was with Jackson at any point during the night of the incident.  Although logic compels the inference that the alleged insult could only have occurred at some earlier point in time, Jackson identifies no record evidence addressing when the alleged encounter between Ras and his sister purportedly occurred.

Moreover, other aspects of Jackson's description of the incident to Wayne undermine the inference that he acted under heat of passion when he killed Ras.  Jackson told Wayne that he had "words" with Ras, then "walked away," and then "was just like, you know, fuck that fuckin n[-----], dude.  Fuck that, fuckin n[-----] and just went back and handled it, you know."  This description conveys a deliberate decision to engage in violence following a period of reflection.  Such " ' "deliberation and reflection" ' " and a violent act

51

undertaken " ' "belatedly as revenge or punishment" ' " are inconsistent with a theory of homicide committed in a heat of passion. (*Hach*, *supra*, 176 Cal.App.4th at p. 1458.) We thus conclude that Jackson's statements to Wayne did not provide substantial evidence supporting a heat of passion voluntary manslaughter instruction.

In his reply brief, Jackson notes for the first time that the jury was instructed with CALCRIM 522 (Provocation: Effect on Degree of Murder) and argues "the same evidence" supported instructing the jury with CALCRIM 570. He further maintains the fact that the jury found him guilty of second degree murder but not guilty of first degree murder indicates the jury determined he acted under provocation.

Even if we were to find good cause for Jackson's failure to raise this argument in his opening brief, we would reject it. (See *People v. Maxwell* (2020) 58 Cal.App.5th 546, 557, fn. 4 [explaining that arguments raised for first time in reply brief, without good cause, will not be considered].) CALCRIM 522 instructs the jury that "[p]rovocation may reduce a murder from first degree to second degree." However, the provocation that reduces a murder from first degree to second degree is *subjective* provocation. (See *People v. Rivera* (2019) 7 Cal.5th 306, 328; *People v. Thomas* (1945) 25 Cal.2d 880, 903.) " 'The test of whether provocation or heat of passion can negate malice so as to mitigate murder to voluntary manslaughter is objective.' [Citation.] 'The test of whether provocation or heat of passion can negate deliberation and premeditation so as to reduce first degree murder to second degree murder, on the other hand, is subjective.' " (*People v. Robbins* (2018) 19 Cal.App.5th 660, 674 (*Robbins*).) Thus, it is not the case, as Jackson contends, that "the same evidence" satisfied both of the provocation instructions.

Moreover, we disagree with Jackson's assertion that the jury's verdict amounted to a finding that he acted under provocation. The jury was instructed on the effects of voluntary intoxication on homicide crimes under CALCRIM No. 625. "[E]vidence of intoxication can operate to reduce a first degree murder to second degree murder." (*Robbins, supra,* 19 Cal.App.5th at p. 674.) Jackson does not argue there was insufficient evidence at trial that he was voluntarily intoxicated at the time of the offense. The jury's verdict is equally reconcilable with a finding of voluntary intoxication.

Having determined there was not substantial evidence supporting a heat of passion theory of voluntary manslaughter, we further conclude that Jackson's constitutional rights were not violated. "[N]o fundamental unfairness or loss of verdict reliability results from the lack of instructions on a lesser included offense that is unsupported by any evidence upon which a reasonable jury could rely." (*People v. Holloway* (2004) 33 Cal.4th 96, 141; accord *Moye, supra,* 47 Cal.4th at p. 555.)

Finally, having found that the trial court did not err, we need not, and do not, address whether the alleged error was prejudicial under *Chapman*. (See *People v. Thomas* (2013) 218 Cal.App.4th 630, 644 [holding that the erroneous failure to give a requested heat of passion voluntary manslaughter instruction is federal constitutional error requiring *Chapman* prejudice analysis].)

## IV.

### *Substantial Evidence Supported the Verdict*

Next, Jackson contends that his conviction was not supported by substantial evidence, and that sustaining the judgment would violate his constitutional right to due process. Jackson does not claim the evidence failed to satisfy any particular element of second degree murder, but instead

maintains the evidence was insufficient to establish that he was the person who committed the murder.

In considering a claim that a conviction is supported by insufficient evidence, we "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578 ; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 319 (*Jackson*).) "[W]e presume in support of the judgment ' "the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Nelson* (2016) 1 Cal.5th 513, 550.) "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "Although we assess whether the evidence is inherently credible and of solid value, we must also view the evidence in the light most favorable to the jury verdict and presume the existence of every fact that the jury could reasonably have deduced from that evidence." (*People v. Reed* (2018) 4 Cal.5th 989, 1006.) "Even identification of defendant by a single eyewitness may be sufficient to establish, beyond a reasonable doubt, defendant's identity as perpetrator of the crime charged." (*Ibid.*)

Here, Jackson contends that "[c]lose review of the video and photographic evidence will show that appellant was not the individual who attacked [Ras] on June 22." He then asserts that a "[r]eview of [his] own taped statements will show a young man worried about being accused of something he didn't do, and in the process falling further down the unfortunate rabbit hole of drug addiction that he was trying to claw his way out of. Those statements will not in any way show a person who is guilty of

murder. There is no forensic evidence from the scene of the killing or anywhere else that implicates [Jackson]. That leaves only the testimony of [H.E.], and a review of [H.E.'s] testimony, statements, record of lying and history of violent crimes [sic] of moral turpitude cannot be found to be substantial evidence upon which any reasonable juror could find appellant to [sic] guilty beyond a reasonable doubt." Again, these assertions are unaccompanied by citations to the record.

Jackson further contends: "[T]he jury was required to speculate that being upset about a girlfriend to the point of wanting to kill oneself, somehow segued into a desire to kill an innocent transient man instead; in an entirely random act of violence. It required the jury to speculate that appellant almost casually confided his guilt to [H.E.], while spending months worrying out loud to family and friends that he was a suspect in a murder he had nothing to do with. And that the one person he confided in, [H.E.], also happened to be the one person in his life who had a real and serious motivation to lie about [Jackson's] involvement. The verdict also required the jury to compare [Jackson], who they knew in the flesh, to the shadowy and distorted figure in the surveillance videos, and speculate they were one and the same person. None of it makes sense."

Jackson's appellate briefing is wholly inadequate to meet his heavy burden of demonstrating the insufficiency of the evidence to support the verdict. Because we approach every appeal with the presumption the judgment is correct, "when a criminal defendant claims on appeal that his conviction was based on insufficient evidence of one or more of the elements of the crime of which he was convicted, we *must* begin with the presumption that the evidence of those elements *was* sufficient, and the defendant bears

55

the burden of convincing us otherwise." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573 (*Sanghera*).)

To prevail, "the defendant must present his case to us consistently with the substantial evidence standard of review." (*Sanghera, supra*, 139 Cal.App.4th at p. 1574; accord *People v. Paredes* (2021) 61 Cal.App.5th 858, 863.) "That is, the defendant must set forth in his opening brief *all* of the material evidence on the disputed elements of the crime in the light most favorable to the People, and then must persuade us that evidence cannot reasonably support the jury's verdict. [Citation.] If the defendant fails to present us with all the relevant evidence, or fails to present that evidence in the light most favorable to the People, then he cannot carry his burden of showing the evidence was insufficient because support for the jury's verdict may lie in the evidence he ignores." (*Sanghera*, at p. 1574.) An appellant cannot prevail on an insufficiency claim, however, "by citing only his own evidence, or by arguing about what evidence is *not* in the record, or by portraying the evidence that is in the record in the light most favorable to himself." (*Id.* at p. 1573.)

Jackson violates these fundamental rules of appellate procedure and thus fails to meet his burden as the appellant. He focuses only on select evidence from the trial, ignoring most of the prosecution's case. He asks us to "close[ly]" review "the video and photographic evidence" and conclude that he was not the perpetrator of the murder. This overlooks that a court of review "resolve[s] neither credibility issues nor evidentiary conflicts" (*People v. Maury* (2003) 30 Cal.4th 342, 403 (*Maury*), disapproved on another ground by *Barnett v. Superior Court* (2010) 50 Cal.4th 890, 901); we may not replace our subjective impression of the visual evidence for that of the jury. To the extent Jackson's argument can be interpreted as a contention that the visual

exhibits admitted at trial did not constitute substantial evidence supporting the jury's implied determination that Jackson was the same individual as the suspect depicted in the video and photographic evidence, we have reviewed these exhibits and reject the contention.

Similarly, Jackson's assertion that "[his] own taped statements" will show a "worried" young man and "not a person who is guilty of murder" inappropriately calls on this court to assess the subjective emotion conveyed by Jackson's vocal tones and substitute our impression of Jackson's credibility for that of the jury, which we cannot and will not do. (See, e.g., *Maury*, *supra*, 30 Cal.4th at p. 403.) Moreover, Jackson provides no record citations to the taped statements he would have us consider. An appellate court presented with a substantial evidence challenge is " 'not required to search the record to ascertain whether it contains evidence that will sustain [the appellant's] contentions.' " (*Sanghera*, *supra,* 139 Cal.App.4th at p. 1574.)

Next, Jackson complains no forensic evidence was presented at trial. As we have noted, however, matters not in the record are of no consequence in establishing the insufficiency of evidence to support the verdict. (*Sanghera*, *supra,* 139 Cal.App.4th at p. 1573.)

Jackson characterizes H.E. as not credible, again ignoring the rule that a court of review "resolve[s] neither credibility issues nor evidentiary conflicts." (*Maury*, *supra*, 30 Cal.4th at p. 403.) To the contrary, "[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Lyons* (1956) 47 Cal.2d 311, 320 (*Lyons*).) Impliedly, the jury found H.E. credible, and we will

not overturn this determination. (See, e.g., *Maury*, at p. 403 [rejecting appellant's argument that the evidence supporting his rape conviction was insufficient because the rape victim's testimony was incredible].)

Finally, as for Jackson's argument that the jury was required to speculate in order to reach its verdict, his repetition of this assertion does not make it true. Speculation is a conclusion reached without a foundational showing. (See, e.g., *People v. Morris* (1988) 46 Cal.3d 1, 21 [explaining, in setting forth the principles applicable to a sufficiency-of-evidence analysis, that "[a] reasonable inference . . . 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work . . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence.' "], disapproved on another ground in *In re Sassounian* (1995) 9 Cal.4th 535, 543, fn. 5.)

Here, contrary to Jackson's argument, the jury was not required to speculate that Jackson confided his guilt to H.E. or that Jackson was the same person as the figure in the surveillance videos; these were matters established by evidence. Jackson is apparently employing the word "speculation" as an aspersion meant to imply the evidence was weak or not credible. Again, however, we do not resolve credibility issues or evidentiary conflicts when reviewing the sufficiency of the evidence to support the verdict. (*Maury*, *supra*, 30 Cal.4th at p. 403.) Jackson's inadequate briefing compels the conclusion that he has failed to sustain his burden of demonstrating the insufficiency of the evidence to support the verdict.

Moreover, setting aside the issue of Jackson's deficient briefing, we have reviewed the trial evidence and conclude ample evidence supported Jackson's conviction for the murder of Ras. Beginning with the chronology of the events leading up to the homicide, identifications by witnesses, and

58

continuing with Jackson's conduct and statements thereafter, the evidence established that Jackson was the person who stabbed and killed Ras.

Mary called 911 at approximately 10:58 p.m. on June 21, 2017. She reported a physical altercation with Jackson, who was wearing clothing consistent with eyewitness descriptions of the assailant's clothing, less than two miles from the homicide. Mary placed this call just after Jackson ran from her house. Caleb found Jackson shortly thereafter and walked Jackson back to Makaela's house. Makaela testified it was around 11:30 p.m. when she and Jackson sat on the steps to the house for a period of five or 10 minutes, and that she went back outside to check on him two or three more times before retiring to the house. She did not see Jackson again that night and, contrary to Jackson's asserted alibi, she could not testify to his whereabouts after she saw him last.

The surveillance video collected by law enforcement methodically documented the assailant's path as he progressed westbound down Newport Avenue toward the site of the homicide. The timing and direction of the suspect's path were consistent with the evidence establishing Jackson's location immediately beforehand. Beginning at approximately 12:12 a.m. on June 22, a person in a hoodie sweatshirt and dark pants, carrying a cell phone, could be seen in surveillance footage walking west on Newport Avenue less than two blocks away from Makaela's house, the precise path Jackson would take if he were to walk directly from Makaela's house to Bacon Street.

The same person was then captured by camera after camera as he continued directly down Newport Avenue to Bacon Street, turned north on Bacon Street, stopped in the street, and turned and engaged with Ras. The ensuing encounter lasted roughly ten minutes and, by all accounts including eyewitness reports, culminated in an assault at approximately 12:25 a.m.

59

The assailant could then be seen in surveillance video fleeing on foot. Not only was the assailant's clothing similar to the clothing described by Mary in the 911 call, but his physical build and facial features, as portrayed in the surveillance video and as described by eyewitnesses, were similar to Jackson's. Even Jackson's age was consistent with Jamie's account that the assailant's body movements seemed like those of a younger person. Further still, Caleb, Riley, and Kasey—all friends or acquaintances of Jackson who were with him on the night of June 21, 2017, hours before Ras was killed—identified Jackson as the suspect captured on the surveillance cameras along Newport Avenue.

Added to the direct and circumstantial evidence identifying Jackson as the assailant were Jackson's statements to Wayne, which were incriminating even if they did not amount to full confessions, and his confessions to H.E. of "pok[ing] that n[-----]," followed by their subsequent discarding of evidence. Although Jackson impugns H.E.'s credibility, "even testimony which is subject to justifiable suspicion do[es] not justify the reversal of a judgment . . . ." (*Lyons, supra,* 47 Cal.2d at p. 320.)

Far from being insufficient, the evidence of Jackson's guilt was abundant. Substantial evidence supported his conviction for second degree murder. We therefore conclude that Jackson's constitutional right to due process of law was not violated. (See *Jackson*, *supra*, 443 U.S. at pp. 313–324.)

V.

*No Cumulative Error*

Jackson argues the cumulative error doctrine applies to his asserted claims of error. "Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant." (*People v.*

60

*Capers* (2019) 7 Cal.5th 989, 1017.)  However, where, as here, there are no errors to aggregate, there is no cumulative error.  (See, e.g., *People v. Lua* (2017) 10 Cal.App.5th 1004, 1019 [cumulative error doctrine did not apply where "we have found no error, though we have considered the issue of prejudice as an alternative basis for rejecting defendant's claims of error"].)

## DISPOSITION

The judgment is affirmed.


DO, J.

WE CONCUR:


HALLER, Acting P. J.


AARON, J.